## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MISTY YATES, as Administratrix for the Estate of Ebony Smith, deceased,** Plaintiff, | **CIVIL ACTION** |
| v. | |
| **LANGHORNE GARDENS HEALTH AND REHABILITATION CENTER, LLC, SHG REWD, LLC, SABER HEALTHCARE GROUP, LLC, SABER HEALTHCARE HOLDINGS, LLC, SHH HOLDINGS, LLC and SABER GOVERNANCE, LLC,** Defendants. | **NO.  24-3261** |

### MEMORANDUM

HODGE, J.                                                                November 12, 2025

Pending before this Court is the Motion to Compel Arbitration by Defendants Langhorne Gardens and Health Rehabilitation Center, LLC; SHG Rewd, LLC; Saber Healthcare Group, LLC; Saber Healthcare Holdings, LLC; SHH Holdings, LLC; and Saber Governance, LLC ("Defendants"). (ECF No. 9 ("Motion").) The Court previously denied Defendants' Motion as to Plaintiff's wrongful death claim (Count III) and held the remainder of the Motion in abeyance pending limited discovery. (ECF No. 13.) For the reasons that follow, Defendants' Motion to Compel Arbitration as to the remaining claims (Counts I and II) is granted.

## I.    BACKGROUND[1]

As previously stated by this Court, this dispute arises out of the tragic death of decedent Ebony Smith, a former resident of Langhorne Gardens Health and Rehabilitation Center and Nursing Center SNF ("Langhorne Gardens"), who died from respiratory failure and tracheostomy

---

[1] The Court adopts the pagination supplied by the CM/ECF docketing system.

failure, allegedly after a nurse pulled the tracheostomy collar from Ms. Smith's throat. (ECF No. 1 ¶¶ 69–70.)

Ms. Smith was admitted to Langhorne Gardens on October 24, 2022. (ECF No. 14 at 3.) In June 2022, Ms. Smith was placed in a medical coma and underwent a tracheostomy. (ECF No. 15-2 ¶¶ 3–4.) Her diagnoses on admission to Langhorne Gardens included anoxic brain damage, cognitive communication deficit, bipolar disorder, anxiety disorder, and chronic respiratory failure with hypoxia, among others. (ECF No. 15-4 at 2–3.) Due to her tracheostomy collar, Ms. Smith was unable to speak; however, progress notes on the date of her arrival state that Ms. Smith could communicate by writing or word mouthing. (ECF No. 11-1 at 23–24.) A subsequent note in her medical records dated October 25, 2022, states that Ms. Smith had difficulty communicating, and established a goal that Ms. Smith would "be able to make needs known." (ECF No. 10-8 at 2.) The note also states that Ms. Smith was "Nonverbal and [a] Poor Historian" and that she had "Mental Illness / Intellectual disability." (*Id.* at 3–4.)

Also on October 25, 2022, Ms. Smith underwent a Brief Interview for Mental Status ("BIMS") in which she scored a 12, which categorized her as "Moderately Impaired." (ECF No. 14-4.) A speech therapy record on the same day states that "Pt presented with impaired cognition and goals were set to target attention and problem solving." (ECF No. 10-11 at 3.) That record provides that Ms. Smith required speech therapy services in order to:

> . . . facilitate nonverbal expression, analyze written expression, improve attention/concentration, promote safety awareness/insight, enhance cognitive skills and develop & instruct in compensatory strategies in order to enhance patient's quality of life by improving ability to communicate basic wants/needs, communicate complex thoughts, ideas, opinions and/or feelings, make choices about clothing, foods and activities, participate in meaningful interactions and safely return to home/community living.

(*Id.* at 4.) An evaluation on November 2, 2022 indicated that Ms. Smith was oriented to person, place, and time, but not to situation. (ECF No. 14-5 at 2.) The nurse's note for the November 2

evaluation provides that Ms. Smith was "alert and stable," and that she was "able to make some needs known." (*Id.* at 7.)

On November 2, 2022, Ms. Smith signed admission paperwork for Langhorne Gardens, which included the Resident and Facility Arbitration Agreement ("Arbitration Agreement"). (ECF No. 9-2.) The Arbitration Agreement states at the top of the first page: "**(NOT A CONDITION OF ADMISSION – READ CAREFULLY).**" (*Id.* at 2.) The third page of the document, shortly before the signature line, provides that "**Signing this Agreement is not a condition of admission, and that care and treatment will be provided to the Resident whether or not he/she signs this Agreement**." (*Id.* at 3.) Directly above the signature line, the Arbitration Agreement states:

> *THE PARTIES UNDERSTAND THAT BY ENTERING INTO THIS AGREEMENT, THE PARTIES ARE GIVING UP THEIR CONSTITUTIONAL RIGHT TO HAVE ANY CLAIM DECIDED IN A COURT OF LAW BEFORE A JUDGE AND A JURY, AS WELL AS ANY APPEAL FROM A DECISION OR AWARD OF DAMAGES.*

(*Id.* at 4.)

The Arbitration Agreement provides that "[a]rbitration shall be the exclusive remedy for resolution of all such legal claims or disputes of any kind now existing or occurring in the future between the Resident (including any party who may pursue an action on behalf of the Resident . . . ) and the Facility." (*Id.* at 2.) Limited claims or disputes carved out from arbitration include: (1) claims involving an amount in controversy with less than $12,000; (2) claims arising in connection with appointment or removal of a guardian for a resident, (3) claims for failure of the resident to cooperate in securing payment from a third party payor or Langhorne Gardens' effort to collect monies due as a result of non-payment; and (4) claims involving "any communications with federal, state, or local officials, including but not limited to, federal and state surveyors, other federal or state health department employees, and representatives of the Office of State Long-Term Care Ombudsman." (*Id.*) Under the Arbitration Agreement, the resident and

Langhorne Gardens equally split the expenses and costs of arbitration unless the arbitrator rules differently. (*Id.* at 3.) Exemplary or punitive damages and attorney's fees are not available under the Arbitration Agreement. (*Id.*)

When Ms. Smith executed the Arbitration Agreement, the only other person present in the room with her was Natalice Hankley, NHA, who is the Administrator of Langhorne Gardens. (ECF No. 14 at 4.) Ms. Hankley reviewed Ms. Smith's records during the admissions process and determined there was nothing indicating she would not be mentally capable of handling her own admissions paperwork. (ECF No. 14-2 ¶¶ 3–5.) For instance, Ms. Hankley noted that Ms. Smith was making all of her own medical, care plan, and financial decisions at Langhorne Gardens. (*Id.* ¶ 5.) Ms. Hankley verbally explained the Arbitration Agreement to Ms. Smith, including explaining that it is voluntary and that signing the agreement waives her constitutional right to a jury. (*Id.* ¶¶ 10–13.) Ms. Hankley's affidavit asserts that "it was very clear to [her] that [Ms. Smith] was able to fully comprehend and understand everything explained to her." (*Id.* ¶ 7.) The admission agreement, including the Arbitration Agreement, was signed electronically on November 2, 2022. (ECF No. 15-6 at 2.)

Ms. Smith died on November 5, 2022. (ECF No. 1 ¶ 2.) Ms. Smith's mother, Plaintiff Misty Yates, acting on behalf of Ms. Smith's estate, has brought claims of negligence (Count I), survival (Count II), and wrongful death (Count III) against Defendants. (*See generally* ECF No. 1.) Defendants assert that these claims are subject to the Arbitration Agreement signed by Ms. Smith. (ECF No. 9.) Previously, this Court denied Defendants' Motion as to Plaintiff's wrongful death claim and held the remainder of the Motion in abeyance pending further discovery on Ms. Smith's cognitive state at the time she entered into the Arbitration Agreement. (ECF No. 13.) The parties subsequently engaged in a limited discovery period and submitted supplemental briefs. (ECF Nos.

14–15.) In their supplemental brief, Defendants argue that Ms. Smith did not lack the legal capacity to enter into the Arbitration Agreement. Plaintiff responds that the Arbitration Agreement is procedurally and substantively unconscionable, and thus, even though Ms. Smith may have had legal capacity to enter into the Arbitration Agreement, the contract is invalid and unenforceable.

## II.    LEGAL STANDARD

A motion to compel arbitration is assessed under the Rule 12(b)(6) standard "where the affirmative defense of arbitrability of claims is apparent on the face of the complaint (or documents relied upon in the complaint)." *Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764 (3d Cir. 2013) (quoting *Somerset Consulting, LLC v. United Cap. Lenders, LLC*, 832 F. Supp. 2d 474, 481 (E.D. Pa. 2011)) (cleaned up). By contrast, where the complaint or its supporting documents do not facially establish "that the parties agreed to arbitrate, or if the opposing party has come forth with reliable evidence that is more than a naked assertion that it did not intend to be bound by the arbitration agreement," then the Rule 56 summary judgment standard applies. *Guidotti*, 716 F.3d at 774 (internal citations and quotations omitted). Because the parties have both relied on evidence outside of the pleadings, the Court finds it appropriate to apply the Rule 56 standard. *See* Fed. R. Civ. P. 12(d) (if "matters outside the pleadings are presented to and not excluded by the court . . . the motion must be treated as one for summary judgment under Rule 56."). In so doing, the Court gives Plaintiff "the benefit of all reasonable doubts and inferences that may arise." *Berkelhammer v. ADP TotalSource Grp., Inc.*, 74 F.4th 115, 116 n.3 (3d Cir. 2023) (internal quotations omitted). "In the event that summary judgment is not warranted because 'the party opposing arbitration can demonstrate, by means of citations to the record,' that there is 'a genuine dispute as to the enforceability of the arbitration clause,' the 'court may then proceed summarily to a trial regarding the making of the arbitration agreement or the failure, neglect, or refusal to perform the same, as

Section 4 of the [Federal Arbitration Act] envisions.'" *Guidotti*, 716 F.3d at 776 (quoting *Somerset*, 832 F. Supp. 3d at 479).

The Arbitration Agreement provides that the Federal Arbitration Act ("FAA") should govern the Arbitration Agreement. (ECF No. 9-2 at 4.) The FAA "enables judicial enforcement of a contract to arbitrate after the court 'hear[s] the parties' and is 'satisfied that the making of an agreement for arbitration . . . is not in issue.'" *Young v. Experian Info. Sols., Inc.*, 119 F.4th 314, 318 (3d Cir. 2024) (alterations in original) (quoting 9 U.S.C. § 4).

In assessing whether there is an enforceable arbitration agreement, courts must affirmatively answer two questions: (1) whether the parties entered into a valid arbitration agreement and (2) whether the dispute at issue falls within the scope of the arbitration agreement. *Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 523 (3d Cir. 2009). Further, it is undisputed that there is a "liberal federal policy favoring arbitration agreements," *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991) (internal quotations omitted), and as such, "[t]here is a strong presumption of arbitrability." *Richards v. Am. Acad. Health Sys., LLC.*, No. CV 20-00059, 2020 WL 2615688, at *8 (E.D. Pa. May 22, 2020) (internal quotations omitted).

Federal courts apply state contract law to determine whether a valid arbitration agreement exists. *See James v. Glob. TelLink Corp.*, 852 F.3d 262, 265 (3d Cir. 2017). Both parties apply Pennsylvania law in their briefing. Because this is a diversity case, this Court applies the forum state's choice of law rules. *Zanitech v. Wal-Mart Stores East, Inc.*, 123 F.4th 128, 140 (3d Cir. 2024). Pennsylvania courts apply a flexible "interest/contacts" methodology to contract choice of law questions. *Hammersmith v. TIG Ins. Co.*, 480 F.2d 220, 226–27 (3d Cir. 2007). Under this approach, the law of the forum with the "most interest in the problem" applies. *Id.* at 227–28. Pennsylvania law properly applies because Plaintiff is domiciled in Pennsylvania, and the contract

6

was executed in Pennsylvania for admission to a facility located in Pennsylvania. *See Nationwide Mut. Ins. Co. v. West*, 807 A.2d 916, 921 (Pa. Super. Ct. 2002).

## III.  DISCUSSION

Both Pennsylvania and the Federal Arbitration Act have a well-established public policy that favors arbitration. *Pisano v. Extendicare Homes, Inc.*, 77 A.3d 651, 660 (Pa. Super. Ct. 2013). A court must compel arbitration where a valid agreement to arbitrate exists. *Taylor v. Extendicare Health Facilities, Inc.*, 147 A.3d 490, 509 (Pa. 2016). "Contracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood and irrespective of whether the agreements embodied reasonable or good bargains." *Nicholas v. Hofmann*, 158 A.3d 675, 693 (Pa. Super. Ct. 2017) (internal quotations omitted). State contract law defenses such as fraud, duress, or unconscionability can make an arbitration agreement unenforceable. *Taylor*, 147 A.3d at 509.

Plaintiff asserts that the Arbitration Agreement is unconscionable and thus there is no valid agreement to arbitrate.[2] Unconscionability is a defense to the validity of a contract. "[A] determination of unconscionability requires a two-fold determination: 1) that the contractual terms are unreasonably favorable to the drafter" (substantive unconscionability), "and 2) that there is no meaningful choice on the part of the other party regarding the acceptance of the provisions" (procedural unconscionability). *MacPherson v. Magee Mem'l Hosp. for Convalescence*, 128 A.3d 1209, 1221 (Pa. Super. Ct. 2015) (internal quotations omitted). Courts applying Pennsylvania law often utilize a "sliding-scale approach" to balance between the two forms of unconscionability such that if, for instance, procedural unconscionability is very high, a lesser degree of substantive unconscionability may be required, and vice versa. *Quilloin v. Tenet Health Sys. Phila., Inc.*, 673

---

[2] Plaintiff does not argue that the claims fall outside of the scope of the Arbitration Agreement.

F.3d 221, 230 (3d Cir. 2012) (citing *Salley v. Option One Mortg. Corp.*, 925 A.2d 115, 125 n.12 (2007)); *Jenkins v. PetSmart, LLC*, No. CV 23-2260, 2023 WL 8548677, at *13 (E.D. Pa. Dec. 11, 2023). However, even under the sliding scale approach, a party challenging a contract as unconscionable must still prove both procedural and substantive unconscionability. *Quillon*, 673 F.3d at 230.

### A.    Procedural Unconscionability

Procedural unconscionability exists where there is an "absence of meaningful choice on the part of one of the parties." *Witmer v. Exxon Corp.*, 434 A.2d 1222, 1228 (Pa. 1981) (internal quotations omitted). Courts have noted that contexts like admission to nursing facilities can create a degree of unconscionability because one party is vulnerable. *See, e.g.*, *Golden Gate Nat'l Senior Care, LLC v. Beavens*, 123 F. Supp. 3d 619, 632 (E.D. Pa. 2015). However, "[c]ontracts cannot be deemed unconscionable simply because of disparity in bargaining power." *Quillon*, 673 F.3d at 235.

The Superior Court identified several non-exhaustive factors for determining unconscionability in an arbitration agreement between nursing facilities and patients, including: (1) physical and mental state of the patient; (2) whether the patient was alone when the agreement was executed; (3) whether the arbitration provision was buried within a lengthy admissions packet that decedent was required to complete while in ill health; (4) whether the patient went to the facility directly from the hospital; (5) whether the patient had the opportunity to research options for facilities; (6) if the patient was financially restrained in their choice of facilities; and (7) whether the patient has financial means for arbitration. *Kohlman v. Grane-Healthcare Co.*, 228 A.3d 920, 927 (Pa. Super. Ct. 2020) ("*Kohlman I*"). When the Superior Court applied its own factors, it found an agreement procedurally unconscionable because incomplete information was given to the

decedent regarding the arbitration provision, and the decedent was sufficiently blind that she was unable to read the document she was signing. *Kohlman v. Grane Healthcare Co.*, 279 A.3d 42, 49 (Pa. Super. Ct. 2022) ("*Kohlman II*").

Plaintiff argues that there was a vast disparity in bargaining power between Ms. Smith and Langhorne Gardens. Specifically, Ms. Smith could not communicate verbally, was assessed as having an actual problem of "Cognitive Loss/Dementia," was assessed as having "Communication and Cognitive Deficit/Nonverbal and Poor Historian," and was assessed as only being able to make her needs known sometimes. (ECF No. 15 at 5.) Plaintiff further argues that Ms. Smith was in a significantly weaker position because she only reached ninth grade in school. (*Id.* at 6.)

Defendants argue that the affidavit from Ms. Hankley provides that Ms. Smith was able to understand the Arbitration Agreement and voluntarily chose to sign it, and that Plaintiff cannot rebut the affidavit. (ECF No. 14 at 14.) Ms. Hankley's affidavit does not account for any of the assessments conducted by Defendants such as the speech therapy record stating that such therapy was needed to enhance cognitive skills, improve Ms. Smith's ability to communicate basic wants and needs, as well as communicate complex thoughts, ideas, opinions, and feelings. (ECF No. 10-11 at 4.) Notably, while Ms. Hankley's affidavit asserts that "it was very clear to [her] that [Ms. Smith] was able to fully comprehend and understand everything explained to her," (*id.* ¶ 7), she provides no information on *how* Ms. Smith communicated that understanding to her. This is particularly relevant where it is undisputed that Ms. Smith could not speak due to her tracheostomy collar, and thus Ms. Smith's communication was restricted. Further, since Ms. Smith's records note that she was not always able to communicate basic needs, it is unclear how Ms. Hankley believes Ms. Smith communicated full comprehension of the Arbitration Agreement.

Given the evidence of Ms. Smith's medical records from her time at Langhorne Gardens up to and including the date when she signed the Arbitration Agreement, it is clear that she was in a significantly weaker position than Langhorne Gardens. Yet that does not, on its own, make the Arbitration Agreement procedurally unconscionable. Rather, the focus is on whether the weaker party had any meaningful choice. *See Rosser v. Crothall Healthcare, Inc.*, 744 F. Supp. 3d 394, 402 (E.D. Pa. 2024) ("In matters where courts found agreements or provisions were procedurally unconscionable, the plaintiffs presented arguments about their educational background, limited employment options, the take-it-or-leave-it nature of the agreements, lack of explanation of terms, and other unique pressures.").

An adhesion contract is one prepared by the party with excessive bargaining power and presented to the other party on a "take it or leave it" basis. *Clymer v. Jetro Cash & Carry Enters., Inc.*, 334 F. Supp. 3d 683, 691 (E.D. Pa. 2018). A contract is not unconscionable merely because it is an adhesion contract. *Salley*, 925 A.2d at 127.

The Arbitration Agreement is not a take-it-or-leave-it contract. It emphasizes at the top of the document, in bold and capitalized font, that it was not a condition of admission. (ECF No. 9-2 at 2.) This information is reiterated in bold shortly before the signature line. (*Id.* at 3.) Ms. Hankley also verbally explained to Ms. Smith that signing the Arbitration Agreement was voluntary. (ECF No. 14-2 ¶¶ 10–11.) Ms. Smith's ninth grade education level permitted her to understand what it means for something to be voluntary. While the *Kohlman II* arbitration clause stated it too was not a condition of admission, there was no evidence in that case that the decedent was aware signing it was voluntary. Because Ms. Smith was informed by Ms. Hankley that the Arbitration Agreement was voluntary, and she had the opportunity to read the agreement that further noted this information in emphasized text in two places, her signing of the Arbitration Agreement does not

reach the level of procedural unconscionability. *See, e.g.*, *MacPherson*, 128 A.3d at 1222 (finding an arbitration agreement between a resident and nursing facility not procedurally unconscionable where, among other reasons, the agreement was voluntary); *Matthews v. Gucci*, No. CV 21-434, 2022 WL 462406 at *10 (E.D. Pa. Feb. 15, 2022) (finding that because the plaintiff "had the ability to opt out" of the arbitration clause, plaintiff had a meaningful choice about whether to accept the terms of the agreement); *Golden Gate*, 123 F. Supp. 3d at 632 (same).

### B.    Substantive Unconscionability

Even if Plaintiff were able to establish that the Arbitration Agreement is procedurally unconscionable, she would also need to establish that the Agreement is substantively unconscionable. A contract is substantively unconscionable where the contractual terms are "unreasonably or grossly favorable to one side and to which the disfavored party does not assent." *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 181 (3d Cir. 1999). Plaintiff asserts that the following provisions are substantively unconscionable: (1) exclusion of certain claims from arbitration; (2) forbidding any appeal; (3) limitation of damages; and (4) splitting of fees and costs.

### 1.    Exclusion of Certain Claims from Arbitration

It is not unconscionable on its face for certain claims to be excluded from the scope of arbitration. *Salley*, 925 A.2d at 128. Rather, the exclusion of certain claims may be unconscionable only if it is grossly favorable to one side. Plaintiff asserts that the Arbitration Agreement's exclusion of specified disputes from arbitration is substantively unconscionable because "every legal remedy the Facility may need to seek vis-à-vis the Resident can be pursued through the judicial process. Meanwhile, all of the Residents claims, including those for neglect and abuse, are relegated to the arbitration forum." (ECF No. 15 at 15.)

11

While the Arbitration Agreement states that two categories of claims "shall __*not*__ be arbitrated," there are effectively four categories excluded: (1) a claim or dispute involving an amount in controversy with less than $12,000; (2) a claim arising in connection with appointment or removal of a guardian for a resident, (3) a claim for failure of the resident to cooperate in securing payment from third party payor or Langhorne Gardens' effort to collect monies due as a result of non-payment; and (4) a claim involving "any communications with federal, state, or local officials, including but not limited to, federal and state surveyors, other federal or state health department employees, and representatives of the Office of State Long-Term Care Ombudsman." (ECF No. 9-2 at 2.)

Plaintiff inaccurately asserts that these exclusions are grossly one-sided. The first and fourth categories are applicable to claims brought by either Langhorne Gardens or a resident. The second and third categories, however, only apply to claims that would be brought by Langhorne Gardens. Plaintiff has not addressed how these specific carveouts are grossly one-sided. While it is apparent that Langhorne Gardens has the ability to bring additional categories of claims against the resident outside of arbitration, that ability alone does not rise to the level of being unconscionable.

### 2.    Limitation on Appeals

The Arbitration Agreement states: "The decision of the arbitrator shall be a final and private undertaking, conclusive, and binding, and no action at law or in equity shall be instituted by either party other than to enforce the award of arbitration. . . . There shall be no appeal of the arbitrators' decision by either party." (ECF No. 9-2 at 2–3.) Plaintiff asserts that this provision necessarily forbids grounds for appeal that are available under the FAA and the Pennsylvania Uniform Arbitration Code and is therefore unconscionable.

While it may be unconscionable to deny one party the opportunity to seek any form of judicial review, *see Jean v. Bucknell Univ.*, No. 4:20-cv-01722, 2021 WL 1521724, at *10 (M.D. Pa. Apr. 16, 2021), this provision is not one-sided. Limitations on appeals are not automatically unconscionable. *See, e.g.*, *MacPherson*, 128 A.3d at 1221–22 (finding agreement that included limitations on appeals not unconscionable). Plaintiff has not articulated how this provision necessarily limits grounds that exist to appeal under the FAA and the Pennsylvania Uniform Arbitration Code. For instance, this provision would not limit the ability of a district court to modify or vacate an arbitration award under 9 U.S.C. §§ 10 or 11 so long as the losing party does not initiate the action. This limitation, which affects both parties equally, therefore is not substantively unconscionable.

### 3.    Limitation on Damages

Plaintiff argues that the Arbitration Agreement's limitation on damages is unconscionable. Specifically, the Arbitration Agreement eliminates exemplary or punitive damages.[3] Exemplary damages are synonymous with punitive damages. *Dragone v. Pew*, 621 F. Supp 3d 561, 568 (E.D. Pa. 2022). Plaintiff relies on *Carll v. Terminix Int'l Co., L.P.*, 793 A.2d 921, 925 (Pa. Super. Ct. 2002) for her assertion that the limitation on damages is unconscionable. *Carll* involved a contract signed by a homeowner containing an arbitration agreement which provided that regardless of any claim of negligence against Terminix, a pest control company, the company's sole responsibility was to "re-treat" the property. *Id.* at 923–24. The Superior Court has more recently limited *Carll*,

---

[3] The Arbitration Agreement also prohibits the award of attorney's fees. However, attorney's fees are not available in negligence cases, and thus Plaintiff is in the same position regarding this expense in the arbitration forum as she would be in court. *See Dragone v. Pew*, 621 F. Supp. 3d 561, 568 (E.D. Pa. 2022) ("Under Pennsylvania law, the parties are usually responsible for paying [attorney's] fees. This general rule applies unless a statute, agreement of the parties or another exception provides otherwise.") (internal citations omitted).

noting that it involved a hazardous business and thus raised specific public policy concerns, and thus it does not stand for the proposition that any limitation of liability is unconscionable. *Fellerman v. PECO Energy Co.*, 159 A.3d 22, 28–29 (Pa. Super. Ct. 2017).

Plaintiff has not established that this limitation is void as against public policy like that in *Carll*. The limitation here is not comparable to the limitation in *Carll*, which would have prevented the ordering of any damages. The Arbitration Agreement does not prevent Plaintiff from being awarded compensatory damages, for instance. This provision therefore is not against public policy and not substantively unconscionable.

### 4.    Fees and Costs

The Arbitration Agreement provides that "the expenses and costs of arbitration shall be split equally amongst the parties unless the arbitrator rules differently." (ECF No. 9-2 at 3.) Additionally, if the parties are unable to agree on an arbitrator, the party moving for arbitration must cover the administration fee in connection with a request for an arbitrator to be selected through the American Health Lawyers Association Alternative Dispute Resolution Service. (*Id.*) In arguing that this is unconscionable, Plaintiff cites to *Kohlman II*, which found that requiring the resident to pay one-half of the costs of any arbitration, including one-half of the arbitrator's fee, to be substantively unconscionable because it is an expense they would not have to bear in a court action. 279 A.3d at 50.

*Kohlman II* differs from two other Superior Court cases addressing unconscionability in arbitration agreements involving nursing facilities. *MacPherson* and *Cardinal*—both of which involved arbitration agreements with nursing facilities—found a requirement for each party to bear its own costs not to be unconscionable. *MacPherson*, 128 A.3d at 1221; *Cardinal v. Kindred Healthcare, Inc.*, 155 A.3d 46, 53–54 (Pa. Super. Ct. 2017). The distinguishing feature between

these decisions and *Kohlman II* is the payment of the arbitrator's fee—an additional expense for bringing a claim that the resident would not have to bear in a court action. *Kohlman II*, 279 A.3d at 50. *MacPherson* and *Cardinal* both provided that the nursing home would pay the arbitrators' fees. *MacPherson*, 128 A.3d at 1217; *Cardinal*, 155 A.3d at 53–54. The Arbitration Agreement here is therefore more similar to *Kohlman II* in this respect.

However, this one provision was not the only aspect of the agreement the court in *Kohlman II* found unconscionable. Notably, *Kohlman II* distinguished itself from *Riley v. Premier Healthcare Management, LLC*, No. 3538 EDA 2019, 2021 WL 2287464 (Pa. Super. Ct. May 28, 2021), which held an arbitration agreement that required the nursing home resident to pay one-half of the costs of arbitration not substantively unconscionable. Specifically, the arbitration agreement in *Riley* excluded claims under $12,000 from mandatory arbitration, the decedent in that case had an opportunity to read the arbitration provisions, and the plaintiff did not argue that payment of half of the arbitration costs created an impediment to asserting claims against the nursing home.

The present case is more akin to *Riley* than *Kohlman II*. The Arbitration Agreement similarly carves out claims under $12,000 from mandatory arbitration, and Ms. Smith had a greater opportunity to read the Arbitration Agreement than the blind decedent in *Kohlman II*. Moreover, while Plaintiff asserts that "Ms. Smith did not have any significant resources of note" (ECF No. 15 at 14), courts have routinely held parties challenging arbitration agreements on affordability grounds to a much higher standard. *See Parilla v. IAP Worldwide Servs., VI, Inc.*, 368 F.3d 269, 284 (3d Cir. 2004) (stating that an arbitration agreement is unconscionable if it "makes the arbitral forum prohibitively expensive for the weaker party"). Thus, considering the fee provision in light of the Arbitration Agreement at large, it does not on its own invalidate the contract as substantively unconscionable.

## IV.    CONCLUSION

Having evaluated the terms of the Arbitration Agreement and deemed the agreement to be valid, question one of the Court's analyses has been answered in the affirmative. In looking at the second question in determining whether an enforceable arbitration agreement exists, Plaintiff has not disputed whether the issue presented falls within the scope of the arbitration agreement. Therefore, the Court deems this prong as conceded and need not address the issue that was uncontested by the litigants. Thus, for the foregoing reasons, the Court grants Defendant's Motion to Compel Arbitration as to Counts I and II. An appropriate Order follows.

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**
_____
**HODGE, KELLEY B., J.**